# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

STANLEY SHINN and PAUL ELLIS,       1:16-cv-777 (NLH/KMW)

          Plaintiffs,       **OPINION**

    v.

FEDEX FREIGHT, INC. and FEDEX
CORPORATION,

          Defendants.

---

**APPEARANCES**:

GRAHAM FAVILLE BAIRD
LAW OFFICES ERIC A. SHORE, P.C.
TWO PENN CENTER
1500 J.F.K. BOULEVARD
SUITE 1240
PHILADELPHIA, PA 19102
    On behalf of Plaintiffs

DAVID S. FRYMAN
AMY LEIGH BASHORE
BALLARD SPAHR LLP
210 LAKE DRIVE EAST
SUITE 200
CHERRY HILL, NJ 08002-1163
    On behalf of Defendant FedEx Freight, Inc.

**HILLMAN**, District Judge

    This is an employment retaliation suit brought under the New Jersey Law Against Discrimination (NJLAD) and the Family and Medical Leave Act (FMLA) by former drivers for Defendant FedEx Freight. Before the Court is Defendant's Motion for Summary Judgment. For the reasons that follow, the Court will grant summary judgment in favor of Defendant.

Unless otherwise indicated, the Court takes its facts from Defendant's Statement of Material Facts and Plaintiffs' Response.  From November 2003 to May 2015, Shinn was what is referred to in the record as a "City Driver" for FedEx at its Delanco, New Jersey Service Center.  From 2004 to July 2015, Ellis was also a City Driver for FedEx at its Service Center. In general, FedEx City Drivers pick up and deliver freight to customers.

FedEx maintained an Electronic Employee Handbook accessible to employees, which included anti-discrimination/retaliation and standards of conduct policies.  Shinn and Ellis signed forms acknowledging FedEx's Electronic Employee Handbook, which included references to those policies.  FedEx employees also received training on workplace violence.  Shinn and Ellis both signed forms acknowledging FedEx's Workplace Violence policy. On March 20, 2015, FedEx discussed workplace violence in a pre-shift meeting with drivers at the Service Center.  Plaintiffs signed a form acknowledging their attendance at this meeting.

**A. April 29, 2015 Break Room Incident**

On April 30, 2015, FedEx employee Jeremy Homan reported to Service Center Manager Chuck Long that an incident had occurred between Steve Buckley, another FedEx City Driver, and Shinn in the break room the previous day.  Other employees also reported

the incident to Long.  As a result, FedEx Security Specialist Charles Bergeron investigated the incident on May 7, 2015, which included interviewing Shinn, Ellis, Buckley, and eleven others who were present in the break room at the time of the incident.

Shinn testified at his deposition that on the day of the incident Shinn was sitting at his regular table with Ellis and some other drivers.  (Tr. at 29-30).  Buckley then came in and walked over to Homan.  (Tr. at 31).  Buckley "said something about Facebook fag or something like that or union fag," at which point Shinn said "what are you talking about."  (Tr. at 31).  Buckley then "came over to the table and he stuck his finger out, he said I'm talking about you and your girlfriend, Paul Ellis." (Tr. at 31).

> A.    And then, you know, it just kind of went from nowhere to where he's screaming at me and I'm screaming at him.  And he kept jabbing his finger in my face.  And then he kind of like ended it with a pretty nasty homosexual slur about me and Paul. And then he turned around and walked away, and said something about he's tired of you union fags, and walked out of the room.
>
> Q.    Okay.  Do you recall what you were screaming at each other?
>
> A.    Well, of course there was a lot of name calling on both parts.  I think I said, you know, let's go outside away from everybody and talk about this.  I guess he took it [as] a fighting term.  But I was just – we had been friends a long time, so I thought maybe we could just talk about it and work it out but . . .
>
> Q.    Do you recall anything else you guys were screaming

about in that exchange?

. . . .

A.   It's a truck drivers room.  I don't know if you
     really — I really feel uncomfortable repeating
     them.  They were pretty bad. . . .  I called him an
     F'ing P, for a lady.

. . . .

Q.   Do you recall any names he was calling you?

A.   Yeah.  He referred to me and Paul as both Facebook
     fags and union fags a couple different times.

(Tr. at 31-35).  There was thereafter a less heated conversation

on the dock, in which Shinn asked if Buckley wanted to talk

about it, but Buckley declined.  (Tr. at 35-36).

According to Shinn, he was called into Long's office and

told that he was discharged, effective May 21, 2015, due to the

incident with Buckley.  Shinn later filed an internal appeal of

his termination with FedEx's Termination Appeal Review Committee

(TARC), which upheld his termination.  Defendant contends the

legitimate reason for Shinn's termination was that he made a

threat that violated its workplace violence policy.

**B. June 28, 2015 Facebook Post**

On June 29, 2015, a FedEx employee gave Long a printed

screenshot of Facebook postings made by Ellis and Shinn on June

28, 2015, which read:

Stan Shinn:   It's funny how low Snakes in the grass
              will stop to kiss a little fedex ass[.]
              people you used to trust and I called

4

> friend sneake [sic] up and ambush you and get me fired just to look good for fedex[.] I wonder who they [are] going to send steve [Buckley] after next
>
> Paul Ellis: Me . . . that fucker just waltz's down the dock every morning happy as can be . . . like nothing happened . . . given the chance . . . he's gonna have an accident on the dock . . . .
>
> Stan Shinnn: Nothing lower than a fellow worker getting another worker fired
>
> Paul Ellis: YUP He's a SCUMBAG

Long was concerned about the message, taking it as a workplace violence incident. Accordingly, he forwarded it to Employee Relations Manager Brian Jenkins. Bergeron investigated. According to Bergeron, Ellis admitted he recognized the post, but claimed he meant that Buckley could get injured because he was not paying attention on the dock. However, according to Bergeron, Ellis advised that he could see how the words he used could be perceived as a threat.

FedEx determined that Ellis's comments in the Facebook post violated the workplace violence provisions in its Conduct of Employees policy. Consequently, FedEx discharged Ellis effective July 9, 2015. Ellis admitted that FedEx's policy prohibiting workplace violence states that it is not limited to physical assaults, but could include written or spoken threats. He also admitted that the policy provides that FedEx could discharge employees for incidents of workplace violence. Ellis

filed an internal appeal of his termination with FedEx's TARC, which upheld his termination. Defendant contends this is the legitimate reason for Ellis's termination.

### C. FMLA Leave

Ellis has spinal injuries that cause him significant back and neck problems. (Tr. at 109). Consequently, Ellis was approved for FMLA leave during his employment with Defendant. (Tr. at 109). He was also approved for leave to take care of his sick mother, again under FMLA. (Tr. at 111-12).

On May 22, 2015, Ellis called out sick because of pain. (Tr. at 123-25). Either the day before or the day before that, he had called out to take care of his mother. (Tr. at 140). Later that day, Ellis saw messages on Facebook from Roy Fonseca, another driver, saying Defendant had Ellis lined up to make deliveries to the retailer BJ's. (Tr. at 125). When Ellis told Fonseca he was not making it in, Fonseca told him Jenkins was mad. (Tr. at 129). Ellis questioned why a "9 o'clock start guy" would be taking that trailer, since he estimated it was loaded around 5:00 AM. (Tr. at 128). Ellis stated it was not on his normal run delivery area. (Tr. at 128).

Ellis said that while some guys like going to BJ's, he "cannot deal with that because [he] h[as] to sit for hours and hours and hours in the driver's room, waiting and waiting and waiting for that to get unloaded." (Tr. at 130). He has told

people, including Brian McGee and Long, that he does not want to go to BJ's. (Tr. at 135). He estimated that he has done a BJ's delivery more than five times, but was unable to estimate whether he had done a delivery there more or less than ten times. (Tr. at 136).

> Q.  Do you know how many times – do you know whether you . . . ever did a BJ's run after you requested FMLA leave?
>
> A.  There was enough times that it revealed a pattern.
>
> Q.  And what do you mean by that?
>
> A.  If I called out for FMLA, you could be expecting a trip to BJ's. And if it wasn't BJ's, it would be a full trailer for what would be normally one of my normal customers, Performance Food Group and Dunkin' Donuts, where it would be driver unload, sort and segregate. 12, 14, 15, 16,000 pounds of freight, breaking down hundreds and hundreds and hundreds of pieces.
>
> . . . .
>
> Q.  When is it, is it your convention that you would receive one of these assignments after having called out for FMLA?
>
> A.  If it wasn't the next day, it was close enough that I would be able to say, boy, this is no coincidence.
>
> Q.  But you agree these were part of your regular job duties; correct?
>
> A.  Breaking down freight, yeah. That could be. To have a whole trailer load thrown on you, no, that's not, that's not – not, not your average day. You know, maybe a couple skids. But certainly not whole trailer loads.

(Tr. at 136-37). When asked whether there were other occasions

when he had full trailers, he said "[t]ypically, no. Because that would be considered a volume run, and that would go out to somebody that had earlier start time." (Tr. at 138).

Ellis contends that FMLA leave was the reason for the termination of his employment – that "they got tired of [him] inconveniencing them with taking random time off, it monkey-wrenched their schedule." (Tr. at 141-42). He based this on the times he had "paybacks for taking off" and "just the attitudes that [he] would get from different people in management." (Tr. at 142). Ellis testified at his deposition that FedEx had a "pattern" of assigning him to BJ's or to deliver a "full trailer" to Performance Food Group or Dunkin Donuts either the next day or very soon after he took FMLA leave. He testified at his deposition:

> I distinctly remember saying to Brian, you know, it's getting to be tit-for-tat with this stuff. You know, you guys are making it, you guys are making it hard to come in here, because I know that there's going to be punishment when I take my Family Medical Leave. And you know, it's getting, it's getting hard to – I forget my exact words, but it's getting hard for me to come into work. I don't like what's going on.
>
> And he said, he said, well, good luck with that. And I said what do you mean. And he says, well, who would hire someone like you.

Defendant maintains the legitimate reason for Ellis's assignment to BJ's or any other less desirable job was because of business demands. FedEx did not guarantee any driver,

including Ellis, a specific route or set of customers. When practicable, FedEx tried to assign drivers to make deliveries in a customary geographic area with which they are familiar but, for business reasons, does not always do so. Business issues on any given day dictated where a driver was assigned that day since FedEx has built its business on delivering freight on time.

FedEx's Service Center sent drivers to BJ's virtually every work day. FedEx did not have a designated driver for BJ's; dozens of drivers serviced BJ's. While BJ's was not one of Ellis's customary customers, it was in the same geographic area in which he usually delivered. Ellis serviced BJ's 6 times between January 1, 2013 and July 9, 2015. FedEx assigned Ellis to BJ's both before and after he was first certified for FMLA leave on July 2, 2013.

### D. Procedural Posture

Plaintiffs filed a state court complaint against Defendants FedEx Freight, Inc. and FedEx Corporation on January 15, 2016. On February 12, 2016, Defendants removed the case to federal court. On March 22, 2016, Plaintiffs voluntarily dismissed their claims against Defendant FedEx Corporation. Plaintiffs thereafter filed an Amended Complaint on April 13, 2016. On May 6, 2016, FedEx Freight filed a Motion to Dismiss, which this Court granted in part and denied in part on December 7, 2016.

Plaintiffs thereafter filed a January 6, 2017 Second Amended Complaint, asserting three claims: (1) an FMLA claim by Ellis, (2) an NJLAD claim by both Plaintiffs, and (3) a common law wrongful termination claim by both Plaintiffs. On January 12, 2018, Defendant filed a Motion for Summary Judgment.

## II.

The Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## III.

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence;

instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); see Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." (citing Celotex, 477 U.S. at 325)).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Celotex, 477

U.S. at 324.  A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s].'" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Cooper v. Sniezek, 418 F. App'x 56, 58 (3d Cir. 2011) (citing Celotex, 477 U.S. at 322).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 257.

**IV.**

The Court finds summary judgment is appropriate as to all counts asserted in Plaintiffs' Second Amended Complaint.  The Court begins with the NJLAD retaliation claim.

**A. NJLAD Retaliation**

The Court will grant summary judgment on Plaintiffs' NJLAD claim for failure to establish a causal link between participation in a protected activity and any retaliation.

The NJLAD provides:

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act because that person has filed a complaint,

12

> testified or assisted in any proceeding under this act
> or to coerce, intimidate, threaten or interfere with any
> person in the exercise of enjoyment of, or on account of
> that person having aided or encouraged any other person
> in the exercise or enjoyment of, any right granted or
> protected by this act.

N.J.S.A. 10:5-12(d). "[T]o establish a prima facie case of discriminatory retaliation, plaintiffs must demonstrate that: (1) they engaged in a protected activity known by the employer; (2) thereafter their employer unlawfully retaliated against them; and (3) their participation in the protected activity caused the retaliation." Tartaglia v. UBS PaineWebber, Inc., 961 A.2d 1167, 1193 (N.J. 2008) (quoting Craig v. Suburban Cablevision, Inc., 660 A.2d 505, 508 (N.J. 1995)).

Under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), after a plaintiff establishes a prima facie case of discrimination, an inference of unlawful discrimination is created. Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 643–45 (3d Cir. 2015).[1] The burden then shifts to the employer who must articulate a legitimate nondiscriminatory reason for the adverse employment action. Id. (citations omitted). This second step of McDonnell Douglas does not require that the employer prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse

---

[1] New Jersey courts have adopted the burden-shifting analysis established in McDonnell Douglas to NJLAD cases. Rich v. State, 294 F. Supp. 3d 266, 279 (D.N.J. 2018).

employment action, but instead the employer must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons.  <u>Id.</u> (citations omitted).

If the employer satisfies this second step, the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual – that not only was the employer's proffered reason false, but the real reason was impermissible discrimination.  <u>Id.</u>  This can be done in two ways:  (1) by pointing to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons, or (2) by pointing to evidence that would allow a factfinder to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action, which can be shown by (1) the defendant having previously discriminated against the plaintiff; (2) the defendant having discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated individuals more favorably.  <u>Id.</u> (citations and quotations omitted).

Plaintiffs' Second Amended Complaint asserts two bases for NJLAD retaliation: (1) "retaliation for participating in an investigation after an incident in the lunch room in which Plaintiffs were referred to as 'union fags' and 'Facebook fags'" and (2) "retaliation for raising complaints to Defendants' management and/or Human Resources concerning the lunch room incident."

Defendant argues Plaintiffs cannot use "raising complaints" concerning the incident as a basis for their NJLAD claim, as they admit they did not report the incident. It is agreed in their Statement of Material Facts that both Shinn and Ellis admitted at deposition that they did not report the break room incident to Defendant. As to Shinn, he admitted in his deposition that he did not report the incident to Defendant. (Tr. at 38). As to Ellis, he also stated he did not know who reported the incident to Defendant. (Tr. at 106). Accordingly, that leaves Plaintiffs' participation in the investigation as the sole basis for the NJLAD claim. Defendant argues that Plaintiffs cannot make a prima facie case because they have not established a causal link. The Court agrees.

Plaintiffs contend that "[t]he temporal proximity alone from the lunchroom/break room incident to the termination of the Plaintiffs creates an inference of retaliation that should be left to the jury to determine." (Pl. Br. 6). Temporal

proximity alone will be insufficient to establish the necessary causal connection, however, when the temporal relationship is not "unusually suggestive." <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 270, 280 (3d Cir. 2000). "[I]f temporal proximity is not clearly suggestive standing alone, a 'time plus' other intervening retaliatory acts will be required." <u>Id.</u>; <u>accord</u> <u>Gladysiewski v. Allegheny Energy</u>, 398 F. App'x 721, 723 (3d Cir. 2010) ("We have recognized two primary ways to substantiate a causal connection between the protected activity and an adverse employment action: showing that the temporal between the two is 'unusually suggestive,' or pointing to an 'ongoing antagonism' between the plaintiff and defendant." (citing <u>Farrell</u>, 206 F.3d at 280-81)). "While there is no <u>per se</u> rule about relying on temporal proximity to establish causation in retaliation cases, the probative value depends on 'how proximate the events actually were, and the context in which the issue came before us.'" <u>Kellerman v. UPMC St. Margaret</u>, 317 F. App'x 290, 292-93 (3d Cir. 2009) (quoting <u>Farrell</u>, 206 F.3d at 279).[2]

---

[2] The same is true of causation in FMLA cases. <u>See, e.g.</u>, <u>Caplan v. L Brands/Victoria's Secret Stores, LLC</u>, 210 F. Supp. 3d 744, 759-60 (W.D. Pa. 2016) ("Evidence that the temporal proximity between the employee's protected activity and the alleged retaliatory action is unusually or unduly suggestive of retaliatory motive can satisfy the causal link requirement. Where the temporal proximity is not sufficient to imply direct causation, evidence of a pattern of ongoing antagonism or an employer's inconsistent reasons for terminating an employee may satisfy the third element of the <u>prima facie</u> case." (citing

The Court discerns the following timeline of relevant

events:

| | |
|---|---|
| 04/29/2015 | Break room incident |
| 05/07/2015 | Investigation of break room incident |
| 05/21/2015 | Effective date of Shinn's discharge |
| 05/22/2015 | FMLA leave and BJ's run |
| 06/28/2015 | Facebook post |
| 07/09/2015 | Effective date of Ellis's discharge |

The difference in time between the investigation and

Shinn's discharge is two weeks.  The difference in time between

the investigation and Ellis's discharge is about two months.

Beginning with Shinn, while two weeks under certain

circumstances might be temporally close enough to the protected

conduct to allow an inference of causation, that is not the case

here, as the legitimate reason advanced by Defendant for Shinn's

termination was his involvement in the break room incident,

which occurred a little over a week before the investigation.

Thus, the Court is unable to find causation based on timing

alone.

As to Ellis, the time between the two events is much

longer, and there was the intervening event of the June 28, 2015

Facebook post, which was much closer in time to his July 9, 2015

---

Farrell, 206 F.3d at 280-81)); Mascioli v. Arby's Rest. Grp.,
Inc., 610 F. Supp. 2d 419, 436 (W.D. Pa. 2009) ("[T]he Third
Circuit articulated two main factors that are relevant with
respect to establishing a causal link to satisfy a prima facie
case of retaliation: (1) timing or (2) evidence of ongoing
antagonism.").

termination. "[I]nferring a causal relationship between the
protected activity and the adverse action is not logical when
the two are separated by an intervening event that independently
. . . caused the adverse action." Houston v. Dialysis Clinic,
Inc., No. 13-4461, 2015 U.S. Dist. LEXIS 83151, at *33 (D.N.J.
June 26, 2015) (second alteration in original) (quoting Mizusawa
v. U.S. Dep't of Labor, 524 F. App'x 443, 448 (10th Cir. 2013)).
Thus, the Court cannot credit Plaintiffs' argument that "the
temporal proximity of the Defendant's termination of the
Plaintiffs' employment to the Plaintiffs' participation in the
Title VII investigation precludes summary judgment." (Pl. Br. at
2).

"Differential treatment of the plaintiff and similarly
situated employees can support the inference [of a causal
link]." Kacian v. Postmaster Gen. of the U.S, 653 F. App'x 125,
129 (3d Cir. 2016). Shinn argues "there was another incident
involving Steve Raidy who asked another driver to step outside
and go across the street to purportedly fight and was not
terminated by Defendant." (Pl. Br. 14). Plaintiff cites
McGee's deposition, Long's deposition, and Buckley's deposition
for this comparison. The Court looks to them each in turn,
beginning with McGee:

> Q. Do you ever remember any other drivers besides Mr.
> Buckley being suspended for arguments or statements
> that they were making to fellow drivers?

A.   Yes.

Q.   Okay.  Tell me about that.

A.   I believe that was Steve Radie got into an argument
     in the break room.

     . . . .

Q.   Okay.  When did that happen?

A.   I really don't remember.  I don't remember.

Q.   More than five years ago?

A.   No.

Q.   Okay.  More than one year ago?

A.   Yes.

Q.   So between five years and one year?

A.   Yes.

Q.   And do you remember anything in more detail about
     what was said by Mr. Radie?

A.   I really don't remember.

Q.   Do you remember the other driver or drivers that
     Mr. Radie was arguing with?

A.   I don't remember.

(Tr. at 33-35).

     Buckley testified as follows:

Q.   Do you know what happened with Mr. Raidy at FedEx?

A.   What do you mean what happened.

Q.   I don't know.  There was an incident involving Steve
     Raidy.  Do you remember what that was?

A.   I think he – from what I heard, he did the same
     thing.  He asked another driver across the street
     to settle something.

Q.   When did that happen?

A.   That I couldn't tell you.  I don't know.

     . . . .

Q.   Do you know whether Mr. Raidy got fired because he
     asked somebody to cross the street?

A.   I don't think he got fired.

     . . . .

Q.   Do you remember the driver who Raidy was arguing
     with?

A.   I believe it was Jim Erickson.

Q.   Do you remember anything else about the Steve Raidy
     matter?

A.   No.

(Tr. at 29-30).

Long testified at his deposition as follows:

Q.   . . . Do you remember what the Steve Radie incident
     is?

A.   No.

Q.   Okay.  Who is Steve Radie?

A.   An employee of FedEx.

Q.   Is he a driver?

A.   Yes.

Q.   Is he still an employee at FedEx?

A.   No, he resigned.

. . . .

Q.    All right.   All right.   Do you know whether he
      resigned because of a workplace violence incident?

A.    He did not resign because of that.

Q.    Okay.   Do you know what the workplace violence
      incident was that related to the Steve Radie
      incident?

A.    No.

Q.    Okay.  Do you know whether another driver was being
      violent towards Steve Radie?

A.    No.

Q.    Do you know whether Steve Radie was being violent
      towards another driver?

A.    Not to my knowledge.

Q.    Did you ever conduct an investigation involving the
      Steve Raide incident?

A.    No.

Q.    Do you know why Mr. Raide resigned?

      . . . .

A.    . . . He took another job somewhere else.

      . . . .

Q.    Okay.  Based on Jenkins Exhibit No. 2, it appears
      that you conducted a workplace violence prevention
      pre-shift that we talked about in response to or
      after the Steve Radie incident.   Would you agree
      with that?

A.    Yes.

Q.    But sitting here today, you have no recollection
      about that incident?

> A.   No, sir.  It was never brought to my attention, no, sir.
>
> Q.   Do you remember talking with anyone about a Steve Radie incident?
>
> A.   No.

(Tr. at 48-50).

The Court finds these vague descriptions of the "Radie incident" to be insufficient to show differential treatment such that the Court can find a causal link.  In response to a summary judgment motion, Plaintiffs must show "specific facts and affirmative evidence" demonstrating a genuine issue for trial. See Anderson 477 U.S. at 257; Celotex, 477 U.S. at 324.  The vague descriptions of the "Raide incident" does not pass this threshold.

Plaintiffs provide no other basis for this Court to find a causal link.  The Court will therefore grant summary judgment on their NJLAD claims because they have not established their prima facie case of retaliation.[3]

---

[3] Even if Plaintiffs met their prima facie case, their retaliation claims still fail because they cannot rebut Defendant's legitimate business reason for their termination.  For Shinn, Defendant states that it terminated Shinn's employment because his incident with Buckley in the break room violated Defendant's workplace violence policy.  Shinn has not provided evidence that would allow the factfinder to disbelieve that reason.  Indeed, in Shinn's deposition, when asked why he thought he was terminated, he stated, "I guess because they thought I was violating their harassment policy by arguing with Buckley instead of just walking away and reporting it."  Shinn also

## B. FMLA Retaliation

The Court also concludes Ellis's FMLA retaliation claim cannot survive summary judgment. "To state a prima facie case for FMLA retaliation, a plaintiff must show that: (1) she invoked her FMLA rights; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the plaintiff's exercise of her FMLA rights." <u>Fiorentini v. William Penn Sch. Dist.</u>, 665 F. App'x 229, 236 (3d Cir. 2016). "FMLA

---

states that he "truly believe[d] part of it was [his] involvement with the union," a claim that is no longer in the case, but even accepting that sentiment as true, he does not refute that the other part of Defendant's reason for terminating him was based on its view, after an investigation involving eleven other employee witnesses, that he violated the workplace violence policy. Thus, Shinn has not shown that the motivating cause of his termination was based on a discriminatory reason.

With regard to Ellis, Defendant proffers that it also terminated him for his violation of the workplace violence policy based on Facebook postings which threatened Buckley's safety on the dock. Ellis admits he made this posting, but argues that he meant that Buckley could get injured because he was not paying attention on the dock. Similar to Shinn, even if a jury accepted that Ellis did not intend his posting to be threatening to Buckley, Ellis has provided no proof that Defendant's determination that the posting violated the workplace violence policy was not legitimate and improperly motivated by discriminatory intent.

The ultimate issue is whether "discriminatory animus motivated the employer," and it is not enough to show that the employer made a "wrong or mistaken" decision. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994). Plaintiffs may disagree with Defendant's conclusion that they violated the workplace violence policy, but Plaintiffs have not provided any material disputed facts that would show that Defendant had discriminatory animus in coming to that conclusion.

retaliation claims are analyzed under the lens of employment discrimination law and claims based on circumstantial evidence are evaluated under the burden-shifting framework of <u>McDonnell Douglas Lichtenstein v. Univ. of Pittsburgh Med. Ctr.</u>, 691 F.3d 294, 302 (3d Cir. 2012)." <u>Id.</u>

The Court finds that Ellis has failed to show sufficient evidence of a causal relation to survive summary judgment. It appears Ellis is alleging adverse employment action both in his termination and the earlier assignment of the BJ's trips. As to his termination, again temporal proximity alone will not suffice to show a causal link. Ellis stated he called out and was given the BJ's job on May 22, 2015 but his termination was not until July 9, 2015. Further, the Facebook post incident occurred in between those events on June 28, 2015. For those reasons stated with regard to Ellis's NJLAD claim, the temporal proximity argument also fails here.

Further, as to the BJ's and similar jobs constituting an adverse employment action, while Ellis testified that his calling out for FMLA leave followed by a BJ's or less desirable job assignment was prevalent enough to constitute a "pattern," Ellis fails to provide any specifics from which this Court could gauge whether such a practice could in fact be inferred. The Court finds the testimony that he called out on FMLA leave once and was then given a BJ's job immediately after insufficient to

show differential treatment such that the Court can find a
causal link.  The "attitude" Ellis described was similarly
vague.  Being told "who would hire someone like you" does not
sufficiently convey a causal link between Ellis's FMLA leave and
either being assigned less desirable jobs or his termination.
Summary judgment will be granted on Ellis's FMLA claim for
failure to establish his prima facie case of retaliation.[4]

### C.  Unlawful termination

Finally, the Court will also grant summary judgment on

---

[4] As with Ellis's NJLAD retaliation claim, even if he met his
prima facie case for FMLA retaliation, Ellis has not shown that
the May 22, 2015 assignment to deliver to BJ's was motivated by
his use of approved FMLA leave, rather than a routine,
legitimate business decision.  Ellis called out of work that
day, and only later discovered through a Facebook post by
another driver that Ellis had been assigned the BJ's route.
Practically speaking, it would have been impossible for
Defendant to retaliate against Ellis by assigning him the BJ's
route for the very same day he called out.  There can be no
claim for retaliation when Ellis did not, and could not,
actually suffer from the alleged retaliation.  To the extent
that Ellis's claims encompass all his assignments to deliver to
BJ's after he was approved for intermittent FMLA leave, Ellis
has failed to show that those assignments were discriminatory,
since (1) the BJ's delivery route did not have a dedicated
driver and the delivery assignments were rotated based on driver
proximity and availability, (2) the basis for his FMLA leave did
not restrict him from such deliveries, and (3) he was only
assigned to BJ's occasionally.  "[T]o avoid summary judgment,
the plaintiff's evidence rebutting the employer's proffered
legitimate reasons must allow a factfinder reasonably to infer
that each of the employer's proffered non-discriminatory reasons
was either a *post hoc* fabrication or otherwise did not actually
motivate the employment action (that is, the proffered reason is
a pretext)."  <u>Fuentes</u>, 32 F.3d at 764.  Ellis has failed to meet
that burden to avoid summary judgment in Defendant's favor.

Plaintiffs' unlawful termination claim.  "Common law claims for wrongful termination are pre-empted when a statutory remedy exists."  Parikh v. UPS, 491 F. App'x 303, 307 (3d Cir. 2012) (stating dismissal was proper where a "wrongful termination claim was based on the same set of facts as [a] discrimination claim[]"); accord Lawrence v. Nat'l Westminster Bank, 98 F.3d 61, 73 (3d Cir. 1996) ("Because the sources of public policy [the plaintiff] relies on are conterminous with his statutory claims, he cannot advance a separate common law public policy claim.").

## V.

For the reasons expressed above, the Court will grant summary judgment in favor of Defendant on all of Plaintiffs' claims.  An appropriate Order will be entered.


Date:  September 7, 2018          s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.